# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

CENTRAL STATES, SOUTHEAST AND
SOUTHWEST AREAS PENSION FUND
and ARTHUR H. BUNTE, JR., as Trustee,

        Plaintiffs,

        v.

NATIONAL CONCRETE PRODUCTS
COMPANY,

        Defendant.

No. 15 CV 3739

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Plaintiff Central States, Southeast and Southwest Areas Pension Fund is a multiemployer pension plan to which defendant National Concrete Products Company made regular contributions on behalf of its unionized employees. When National Concrete reduced its contribution rate, Central States assessed its withdrawal liability under the Employee Retirement Income Security Act, as amended by the Multiemployer Pension Plan Amendments Act of 1980, and determined that National Concrete was subject to $2,589,136.36 in partial withdrawal liability, payable in monthly installments. After National Concrete closed its doors and stopped contributing entirely, Central States assessed a complete withdrawal liability of $1,874,717.93. It also declared an event of default and demanded payment of this amount in full. National Concrete disputes both of these assessments and, as required by the applicable statute, seeks resolution in arbitration. Central States and its trustee, Arthur H. Bunte, Jr., filed an action to

collect payment while that arbitration is pending, and they now move for summary judgment. For the following reasons, the motion is granted.

## I.    Legal Standards

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014); Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A court must "construe all facts and reasonable inferences in the light most favorable to the non-moving party." *Apex Digital, Inc. v. Sears, Roebuck, & Co.*, 735 F.3d 962, 965 (7th Cir. 2013).

## II.    Facts

As required by a collective bargaining agreement, defendant National Concrete Products Company made pension contributions on behalf of some of its employees to plaintiff Central States Southeast and Southwest Areas Pension Fund, a multiemployer pension plan. [26] ¶ 6.[1] National Concrete started making these contributions in 1971, but its contributions declined by at least 70% by the end of 2011. [26] ¶¶ 6–7. Around September 19, 2014, Central States notified

---

[1] Bracketed numbers refer to entries on the district court docket. The facts are largely taken from National Concrete's response to Central States's LR 56.1 statement, [26].

National Concrete that the contribution decline constituted a "partial withdrawal" from the plan, subjecting National Concrete to partial withdrawal liability in the amount of $2,589,136.36. [26] ¶¶ 7–9. It also demanded payment in full by October 1, 2014, or in monthly installments of $18,486.21, beginning on that day and continuing until September 1, 2034. [26] ¶ 9. When National Concrete failed to meet the October 1 payment deadline, Central States sent another notice of its payment obligations. [26] ¶ 10. As of the filing of this motion, National Concrete had not made any of its partial withdrawal liability payments. [26] ¶ 14. But on January 19, 2016, the day on which National Concrete filed its response brief, it made a payment in the amount of $18,486.21.[2] [29] ¶ 2; [34-1] ¶ 3.

Around November 2, 2014, National Concrete ceased operations, ending its contribution obligation entirely—a "complete withdrawal" from the pension plan.[3] [26] ¶ 15; [34] at 4. On January 15, 2015, Central States notified National Concrete that its complete withdrawal subjected it to an additional $1,874,717.93 in withdrawal liability. [26] ¶¶ 16–17; *see also* [28] at 2. The notice also demanded full and immediate payment of that amount by February 1, 2015. *Id*. National Concrete has not made any payments related to its complete withdrawal liability. [26] ¶ 21.

[2] In its sur-reply, National Concrete attaches an affidavit attesting to a second payment, dated February 11, 2016, in the same amount, but Central States has not had an opportunity to acknowledge that payment. [34-1] ¶ 4.

[3] In the parties' LR 56.1 statements, they agree that National Concrete "permanently ceased to have an obligation to contribute to Central States or permanently ceased all covered operations," parroting the conditions of a complete withdrawal listed in 29 U.S.C. § 1383(a). [26] ¶ 15. In its reply brief, Central States asserts that National Concrete ceased all operations—not just those operations covered under the pension plan—and attaches a letter in support. [27] at 3, 7; [27-2] at 2. Because Central States failed to include this in its LR 56.1 statement of facts, National Concrete was granted leave to file a sur-reply, in which it did not dispute that the company shut down completely. *See* [34] at 4.

National Concrete disputes both withdrawal liability assessments. It requested that Central States review the partial withdrawal liability assessment on December 17, 2014, and on May 14, 2015, after Central States upheld its determination, National Concrete initiated arbitration proceedings. [26] ¶¶ 11–13. Its April 15, 2015 request for review of the complete withdrawal liability assessment did not fare any better, and National Concrete initiated arbitration to challenge that assessment on August 5, 2015. [26] ¶¶ 18–20. The two matters were consolidated, and the arbitration is currently pending. [26] ¶ 20.

## III. Analysis

When employers stop participating in, or substantially reduce their participation in, multiemployer pension plans, they incur withdrawal liability. *See* 29 U.S.C. § 1381. If an employer partially withdraws from the plan (e.g., if its contributions drop by 70% within a specified time period), it incurs partial withdrawal liability. *Id.* § 1385. If it stops participating in the plan entirely, it incurs complete withdrawal liability. *Id.* § 1383. The amount of the liability is related to the employer's share of the plan's "unfunded vested benefits." *Id.* § 1381(b)(1). Imposing this liability prevents funding deficiencies, ensures that the remaining employer participants do not have to pay disproportionate shares of the plan benefits when one of them withdraws, and avoids deterring new employers from joining the plan. *Tsareff v. ManWeb Services, Inc.*, 794 F.3d 841, 846 (7th Cir. 2015).

4

To collect withdrawal liability from an employer, a plan must first calculate the amount of the liability and an appropriate payment schedule, and send the employer a notice and demand for payment. 29 U.S.C. §§ 1382, 1399(b)(1), 1399(c); *Cent. States, Se. & Sw. Areas Pension Fund v. Bomar Nat., Inc.*, 253 F.3d 1011, 1015 (7th Cir. 2001). "The employer may seek review of these calculations and then challenge the plan's determination in arbitration, but it must pay even while the review and arbitration are pending." *Cent. States Se. & Sw. Areas Pension Fund v. O'Neill Bros. Transfer & Storage Co.*, 620 F.3d 766, 768 (7th Cir. 2010) (citing 29 U.S.C. §§ 1399(c)(2), 1401(d)). Of course, "if the employer prevails on its challenge, it will get its money back." *Id.* at 772. The imposition of those interim payments creates a "pay now, dispute later" rule, which "serves the dual purpose of reducing the risk that an employer will not pay and of encouraging speedy adjudication by requiring immediate arbitration before the courts become involved in the merits of the dispute." *Bomar*, 253 F.3d at 1015.

"To further ensure the financial stability of the plan, . . . in the event of a default, the pension plan may demand immediate payment of the outstanding amount of withdrawal liability." *O'Neill*, 620 F.3d at 768 (citing 29 U.S.C. § 1399(c)(5)). Consistent with the rest of the statutory scheme, if a plan sponsor declares a default and makes such a demand, the entire amount of the withdrawal payment is immediately payable, even if arbitration is pending. *Id.* at 775.

## A.  Partial Withdrawal Liability

With respect to the $2,589,136.35 partial withdrawal liability assessment, National Concrete concedes that it is required to make monthly payments to the fund in accordance with the fund's preferred payment schedule, even while the arbitration is pending. National Concrete also admits that it failed to make any payments in the first fifteen months of the payment schedule. It does not oppose Central States's arguments relating to those past-due payments, "[s]ubject to an appropriate affidavit to prove up the amounts owed." [24] at 1. Central States seeks (1) all past-due interim payments; (2) interest on those payments; (3) the greater of the interest on the delinquent payments or 20% of the unpaid principal amount; (4) attorney's fees; and (5) costs—all of which are available under 29 U.S.C. § 1132(g). And it requests three weeks to file affidavits establishing those amounts. Because National Concrete does not object, summary judgment is granted with respect to the partial withdrawal liability, and Central States shall have three weeks to file affidavits establishing the amounts owed.

## B.  Complete Withdrawal Liability

National Concrete does object to Central States's demand that it pay the $1,874,717.93 complete withdrawal liability assessment while the arbitration is pending. It does not challenge in this action Central States's assessment itself. That dispute is properly before an arbitrator. *See* 29 U.S.C. § 1401(a)(1). And it does not dispute that Central States provided timely notice of the withdrawal liability. It also does not suggest that the "pay now, dispute later" scheme is limited to partial

withdrawal liability assessments but not complete withdrawal liability assessments. Presumably, it would not oppose the imposition of an interim payment schedule similar to the one Central States provided with respect to the partial withdrawal liability assessment. It objects only to Central States's finding of default and its demand that National Concrete pay the complete withdrawal liability in full.

A pension plan may declare an event of default and demand immediate payment of the outstanding amount of an employer's withdrawal liability in two scenarios. Under § 1399(c)(5)(A), an event of default occurs if the employer misses a payment deadline by over 60 days. But this applies only when the withdrawal liability is not in dispute, either because arbitration has not been initiated or because arbitration has concluded. *O'Neill*, 620 F.3d at 773. In other words, interim payments that are scheduled while arbitration is pending "cannot serve as the basis for a missed-payment default" under § 1399(c)(5)(A). *Id.* Under § 1399(c)(5)(B), an event of default includes "any other event defined in rules adopted by the plan which indicates a substantial likelihood that an employer will be unable to pay its withdrawal liability." Here, the plan rules, contained within a separate document, describe several events that constitute default. *See* [27-1] App. E, § 5(e)(2). Among them are (1) "the Employer's failure or inability to pay its debts as they become due;" (2) "the cessation of all or substantially all of an Employer's operations;" (3) "the existence of a delinquency in any amount owed to the Pension Fund including, without limitation, the payment of contributions or prior withdrawal liability;" and

(4) "any other event or circumstance which in the judgment of the Trustees materially impairs the Employer's credit worthiness or the Employer's ability to pay its withdrawal liability when due." *Id.* "When these events occur, the plans may accelerate the entire amount of withdrawal liability." *O'Neill*, 620 F.3d at 771.

Central States claims it was justified in declaring default and demanding payment in full based on each of the scenarios described above, although just one of them will do. As of January 15, 2015, when Central States sent its notice and demand for payment of the complete withdrawal liability, National Concrete had ceased all of its operations and already failed to make its first four scheduled payments towards its previously assessed partial withdrawal liability. National Concrete's shutdown and its four-month delinquency clearly fit the descriptions of those events defined by the plan rules as events of default, and National Concrete does not argue otherwise. National Concrete's primary argument seems to be that citing the examples of events of default provided in the plan rules is insufficient to show that National Concrete is not creditworthy or unable to pay its complete withdrawal liability. It notes that Central States has not examined National Concrete's financial statements, deposed any employees or corporate representatives, or submitted any evidence relating to its financial condition or ability to meet its financial obligations. But under § 1399(c)(5)(B), Central States does not need to show a certainty that National Concrete cannot pay its total withdrawal liability. It need only show that a substantial likelihood exists, as indicated by some occurrence identified in the plan rules. Here, the plan rules

include three different examples of such an occurrence (not including the catch-all example that relies on Central States's judgment of National Concrete's creditworthiness), each of which resembles the current scenario. That is sufficient to warrant finding that Central States properly declared default.

National Concrete makes a few other arguments against a judgment ordering full payment. First, it argues that its failure to make interim payments towards its partial withdrawal liability cannot be the basis of default under § 1399(c)(5)(B), because the Seventh Circuit held in *O'Neill* that a missed interim payment cannot be a basis of default under § 1399(c)(5)(A). *See O'Neill*, 620 F.3d at 773. This argument fails, because National Concrete did not simply miss a payment—it failed to make any payments for (at the time of the notice) over four months. It also shut down its operations. Both actions serve as independent bases for declaring default under § 1399(c)(5)(B) and the plan rules.

Next, National Concrete argues that cessation of operations cannot provide a basis for default under § 1399(c)(5)(B), even if the plan rules explicitly say so, because then default may be declared whenever complete withdrawal liability is incurred under § 1383. It argues that this conflicts with another provision that allows for a twenty-year-long payment plan. *See* 29 U.S.C. § 1399(c)(1)(B). But National Concrete confuses the cessation of "covered operations," which triggers complete withdrawal liability under § 1383, with the complete cessation of operations, which constitutes an event of default under the plan rules. The cessation of covered operations signifies the end to an employer's participation in

9

the fund, but does not necessarily imply that the employer is now defunct or even financially insecure. Shutting down the company's operations entirely may reasonably indicate a substantial likelihood that the employer will be unable to meet its obligations. In such a scenario, demanding immediate payment in full is the wiser course of action, for if a "fund is unable to collect quickly, it likely never will collect." *O'Neill*, 620 F.3d at 774.

Finally, National Concrete says that Central States is unjustified in declaring default, because National Concrete has now made two interim payments and is dutifully paying other creditors, as well. But these recent payments are insufficient to defeat summary judgment. It is undisputed that, in addition to shutting down its operations, National Concrete failed to make any payments for over fifteen months. As a result of National Concrete's conduct, the applicable statutes and the plan rules allow Central States to declare default and demand immediate payment in full. National Concrete made its first payment towards its partial withdrawal liability on the same day that it filed its response brief to this motion, in an attempt to showcase its creditworthiness and avoid the consequences of the "pay now, dispute later" rule. Unfortunately, this attempt at repayment was too little, too late. The declaration of default was justified by National Concrete's earlier cessation of all operations and failure to make payments.

Therefore, summary judgment is granted with respect to the complete withdrawal liability.[4] Central States has three weeks to submit affidavits and a proposed judgment order to establish the amounts owed.[5]

## IV.    Conclusion

Central States's motion for summary judgment, [16], is granted. Central States has leave to file affidavits and a proposed order establishing the judgment amounts by 9/6/16.

ENTER:

_____
Manish S. Shah
United States District Judge

Date: 8/16/2016

---

[4] Central States also argues that National Concrete's affirmative defenses—that the statutes establishing withdrawal liability violate the due process clause and the takings clause of the Fifth Amendment—are meritless. National Concrete does not mention these affirmative defenses in its response brief, so any opposing arguments are waived.

[5] In its sur-reply, National Concrete misstates the amount of the complete withdrawal liability assessment as $2,589,136.36. [34] at 1. This is likely a typographical error, but it is worth clarifying. The complete withdrawal liability assessment, for which Central States demanded payment in full, is $1,874,717.93. The partial withdrawal liability assessment is $2,589,136.36, for which Central States initially requested payment either in full or in monthly installments (but now seeks payment in monthly installments).